IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 4, 2025

## ZACHARY THOMPSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 17-01165        Paula L. Skahan, Judge

_____

### No. W2025-00610-CCA-R3-PC

_____

The Petitioner, Zachary Thompson, appeals from the Shelby County Criminal Court's denial of his petition for post-conviction relief, arguing that the post-conviction court erred in finding that he failed to establish that trial counsel rendered ineffective assistance. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

STEVEN W. SWORD, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, (on appeal); Alex Jones, Memphis, Tennessee, (at hearing), for the appellant, Zachary Thompson.

Jonathan Skrmetti, Attorney General and Reporter; Park Huff, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Melissa Harris, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.        FACTUAL AND PROCEDURAL HISTORY

#### A. TRIAL

In March 2017, a Shelby County Grand Jury returned a one-count indictment charging the Petitioner with first degree premeditated murder, following his shooting of the victim, Anthony Pope. *State v. Thompson*, No. W2019-00023-CCA-R3-CD, 2020 WL 4919799, at *1 (Tenn. Crim. App. May 5, 2020), *perm. app. denied* (Tenn. Jan. 15, 2021).

The evidence adduced at the Petitioner's November 2018 trial established the following facts, as set forth by this court on direct appeal:

On the morning of August 29, 2016, Freddie Thomas heard gunshots as he drove down Hawkins Mill Road in Memphis. He looked over toward the Hawkins Mill Market and saw the victim, Anthony Pope, "jump" or "twist" from being shot and then running toward the market's door. Mr. Thomas also saw the shooter, who looked familiar to him. He noted that the shooter "wasn't playing" and that he "aimed to shoot." Mr. Thomas saw a police car at a nearby traffic light, and he flagged the officer down and told him about the shooting. He gave a description of the shooter to the officer, and he also saw what he thought was the shooter's vehicle drive past them. Mr. Thomas testified that the vehicle was traveling "just slowly but surely . . . like ain't nothing happened." Mr. Thomas followed the officer back to the market, and he walked inside to look for the victim. Mr. Thomas found the victim in the third aisle of the market, and the victim said that [the Petitioner] had shot him. The victim was able to talk even though he was bleeding from his chest. Mr. Thomas testified that the victim also told the responding officers that [the Petitioner] shot him.

Officer Dwayne Nesbit of the Memphis Police Department testified that he drove to the Hawkins Mill Market after being approached by Mr. Thomas who informed him of the shooting. When he arrived at the market, he saw the victim in the parking lot with a gunshot wound to his chest. The victim then got up, closed the door to a white car, and staggered into the market. Officer Nesbit remained outside while other officers who had arrived on the scene went inside the market and talked to the victim. He said that two men at the scene said that they saw a weapon and that it was in one of the cars there. Officers Rob Wiggins and Alphonzo Jenkins of the Memphis Police Department testified that they found the victim inside the Hawkins Mill Market, and he told them that [the Petitioner] shot him. The victim was taken to the hospital and later died from the gunshot wound to his chest. Dr. Marco Ross testified that there was an entrance wound to the right outer portion of the victim's chest and an exit wound to the left front portion of his chest.

Mohamed Aziz was working at the Hawkins Hill Market when the shooting occurred. He said that the victim was a regular customer, and there was nothing unusual about his transaction with the victim that morning. The market's surveillance video, which Mr. Aziz gave to police, showed that the

victim walked in the market at approximately 8:49 a.m. The victim purchased some items, received his change, and opened the front door to leave the market. Mr. Aziz then heard gunshots. He testified that he did not see the victim in possession of a gun until after the victim was shot and re-entered the market.

Detective James Smith of the Memphis Police Department, Homicide Division, testified that he investigated the victim's murder. He said that [the Petitioner] had already been identified as the suspect when he was assigned the case. Detective Smith interviewed [the Petitioner] the following day, August 30, 2016, with his attorney present. [The Petitioner] admitted that he was responsible for the victim's death. He knew the victim through [the Petitioner's] ex-girlfriend, Nakisha Reed.[1] [The Petitioner] said that he had previously been threatened by the victim through Facebook. When asked why he was at the Hawkins Mill Market on August 29, 2016, [the Petitioner] said:

> I was looking for Nakisha Reed to question her about a note left on my baby's momma's car, and a flat tire on her car. After calling her several times, I drove to her house but she wasn't there. I spoke with her on the way back to my house. She said she was at her job off Shelby Dr. I asked her about what job(,) so she lied(,) and I said don't even worry about it. I proceeded to the house and seen her car at the store . . . I pulled behind her car and proceeded to walk in the store to talk to her. [The victim] was walking out [of] the store and he said, "What's up bitch?" and he reached for a weapon and shot, and I shot back at him three times. I hopped in the vehicle and left the scene and went to [Shanterrica White's] house on Mitch St.

[The Petitioner] told Detective Smith that he armed himself when he got out of his car at the market because he "didn't feel safe around [Ms. Reed] anymore." Although [the Petitioner] claimed that he acted in self-defense, he said that he was afraid to call police after the shooting. When asked if he chased the victim while shooting at him, [the Petitioner] replied: "I stepped up and shot." He denied pursuing the victim into the market. [The Petitioner] said that he did not see a gun in the victim's hand as he walked out of the

---

[1] In the transcript from the post-conviction hearing, Ms. Reed's first name is spelled "Nykeshia." As Ms. Reed spelled her name as "Nakisha" for the court reporter at trial, we will use the spelling from the trial transcript for consistency.

store but the victim "revealed the gun and let a shot off." [The Petitioner] said that the victim pointed his gun at [the Petitioner] almost immediately after saying, "Bitch what's up," and he thought that the victim was shooting at him when the victim pulled the gun. When asked why he thought that, [the Petitioner] responded that it was because the victim had already said what he was going to do to [the Petitioner]. He concluded his statement by saying: "This is a situation where no harm was really intended. I just wanted to talk to Nakisha [Reed]. I'm truly sorry I took someone's life. I acted out of self-defense." [The Petitioner] told police that his gun was at Ms. White's house. A Beretta .40 caliber semi-automatic pistol along with an empty magazine was later recovered from underneath the mattress in Ms. White's bedroom.

Detective Smith received the surveillance video from the Hawkins Hill Market and reviewed it. The surveillance video, which depicted several angles of both the inside and the outside of the market, showed that [the Petitioner] pulled into the Hawkins Mill Market parking lot at approximately 8:50 a.m. and blocked in the white car that the victim had driven there. [The Petitioner] got out of the vehicle with a gun in his hand, by his right side, and he raised the gun as he approached the store. Detective Smith testified that the victim left the market with a plastic bag in one hand and what appeared to be a cell phone in his other hand. It also appeared that the victim was in the process of placing the cell phone in his pocket and bringing his hand back up when he was shot by [the Petitioner] as the victim walked out of the market. Detective Smith testified that the victim did not fire a shot or have a gun in his hand as he left the market, which contradicted [the Petitioner's] claim of self-defense. The victim re-entered the market after he was shot, fell down, and retreated to the back of the market. [The Petitioner] pursued the victim as the victim ran back into the market, and [the Petitioner] pointed his gun inside the door. Detective Smith testified that the video showed both of the victim's hands when he fell down, and the victim did not have a gun in his hands at the time. Detective Smith testified that the video showed that the victim had a gun in his hand once he retreated back into the market, and the victim fired one shot. The victim left the market after being shot and walked over to a silver car with two individuals sitting inside. He then walked over to the white car that he had driven to the market, placed something inside the car and took some items out, and walked back inside the market. Detective Smith testified that a Glock .40 caliber semi-automatic pistol with a bullet in the chamber and shell casings were collected from the scene. The gun was found inside the white car. A backpack containing a magazine clip with thirteen rounds was also recovered from the scene. One

shell casing was found in the back of the market in the area where the victim was located. There were several shell casings located outside of the market and one just inside the door.

Shanterrica White testified that [the Petitioner] is her child's father, and she spent the night before the victim's murder at his house where he lived with his mother. Ms. White said that [the Petitioner] left the house sometime that morning and then returned. He left the house again thirty to forty-five minutes later. Ms. White testified that [the Petitioner] later called and told her to leave the house, and he said: "I think I shot somebody." Ms. White drove to her mother's house on Mitch Street. [The Petitioner] came to the house later and told Ms. White what happened. After [the Petitioner] was taken into custody, he called Ms. White and told her that he had put the gun used in the shooting in her bedroom.

Nakisha Reed testified that the victim is her daughter's father, and Ms. Reed and the victim were dating at the time of his death. She and [the Petitioner] worked together, and they had previously dated for approximately one month. Ms. Reed testified that the victim had spent the night at her apartment and left the morning of the shooting sometime around 9:00 a.m. She said that the victim was driving her car and said that he was going to his mother's house. Ms. Reed testified that [the Petitioner] called her several times that morning while the victim was still at her apartment. Ms. Reed answered the phone one time, and [the Petitioner] asked if she and the victim were back together and if she had shot his girlfriend's car. [The Petitioner] also told her that the victim had sent him a video of her and the victim having sex. Ms. Reed said that she told [the Petitioner] that she and the victim were back together and that it was none of [the Petitioner's] business. She noted that the victim left her apartment approximately five to ten minutes after she spoke to [the Petitioner].

Ms. Reed testified that approximately one and a half hours after the victim's murder, she texted [the Petitioner] and asked if he shot the victim. [The Petitioner] initially replied: "Dam [the victim] got shoot [sic]?????" After that he texted: "What [are] [you] talking about I shoot dude!!! Quit text[ing] my phone with that foolishness" and "[You] ain't bout to put that [expletive] on me!" Ms. Reed also testified that [the Petitioner] called her while she was on her way to the murder scene and said he knew she was not in her car. Ms. Reed testified that she was aware that the victim and [the Petitioner] each carried a gun.

Ms. Reed testified that approximately two weeks before the victim's murder, the victim and [the Petitioner] were "going back and forth" about her. Evidence was introduced at trial of a Facebook conversation between [the Petitioner] and the victim. In the conversation, [the Petitioner] told the victim that he knew where the victim lived. [The Petitioner] also sent the victim a picture of the victim's house. The victim responded: "Come on watch [you] meet [your] maker [I know] were [you] stay homie [you] a bitch." The victim also sent a picture of ammunition with a message that read: "Pull since you know where I stay." Ms. Reed testified that this meant for [the Petitioner] to come to the victim's house.

Ms. Reed testified that she was at [the Petitioner's] house around midnight on August 15, 2016, and she heard gunshots and saw a car drive by. [The Petitioner] called police to the scene and told them about the picture of ammunition the victim had previously sent him, which was the same brand as the shell casings found at his house after the shooting. [The Petitioner] also informed them about the conflict between himself and the victim. Officer James Johnson testified that [the Petitioner] gave him three shell casings that [the Petitioner] said he found across the street. All three of the casings were TulAmmo brand. One casing was .40 caliber and the other two were .380 caliber.

Detective Brian Vincent of the Memphis Police Department testified he spoke with [the Petitioner] about the shooting at his house. [The Petitioner] initially wanted to prosecute the victim for sending the Facebook messages and the shooting. However, he changed his mind after he was asked to come to the police station and make a statement and show all of the Facebook messages. [The Petitioner] refused to give a statement, and he signed a "refusal to prosecute" form. He also said, "I ain't going to put nobody in jail that don't need to be in jail." Detective Vincent testified that he was unable to prove that the victim perpetrated the shooting at [the Petitioner's] house.

Kasia Lynch of the Tennessee Bureau of Investigation Crime Lab, Firearms Identification Unit, testified that she examined the shell casings recovered from the shooting at the Hawkins Mill Market and the shell casings that [the Petitioner] gave officers from the shooting at his house on August 15, 2016. Agent Lynch also examined a .40 caliber Smith and Wesson pistol manufactured by Beretta recovered from the residence on Mitch Street and a .40 caliber Glock pistol recovered from a car at the murder scene. Agent Lynch testified that of the four shell casings recovered from [the] murder

scene, one of them was fired from the .40 caliber Glock pistol. The three other casings were consistent with being fired from the .40 caliber Beretta. Agent Lynch testified that the two .380 and one .40 caliber shell casings found after the shooting at [the Petitioner's] house were not fired from either weapon found at the murder scene.

*Id*. at *1-4.

On direct appeal, this court affirmed the Petitioner's conviction for premeditated first degree murder, finding that the evidence was sufficient to support his conviction and that the trial court did not err in its determination that the proof did not fairly raise self-defense. *Id*. at *1.

## B. POST-CONVICTION PROCEEDINGS

On December 22, 2021, the Petitioner filed a timely *pro se* petition for post-conviction relief, alleging that he received the ineffective assistance of counsel at his preliminary hearing, at trial, and on appeal. The post-conviction court appointed counsel, but no amended petition was filed. The record also contains no response from the State to the *pro se* petition. The post-conviction court held a hearing on the *pro se* petition on October 25, 2024, almost three years after the petition was filed.

The Petitioner testified that the only time trial counsel visited him at the jail was just after his cousin retained him. The Petitioner did not know how many times trial counsel may have spoken with his family members. The Petitioner stated that a second attorney also represented him at trial, but he did not meet the second attorney before the trial. He said he was not raising any issues concerning the second attorney. The Petitioner testified that his cousin provided trial counsel with copies of some texts, which he asserted explained what was going on between himself and the victim prior to the shooting.

The Petitioner testified that he received discovery by mail, including police reports, witness interviews, crime scene photos, and the autopsy. The Petitioner, however, asserted that trial counsel should have provided discovery much sooner than he did. The Petitioner testified that some photographs and other items were not included in the discovery and that he did not see them until the post-conviction process. He identified several such photographs, including photos of guns being held by unidentifiable individuals, text exchanges between the Petitioner and the victim, a photograph of the victim with the words "In Guns We Trust," and a screenshot of the Petitioner's address. The Petitioner opined that these photographs demonstrated the victim had threatened him.

The Petitioner stated that trial counsel never discussed a defense with him, and he guessed they had intended to present a theory of self-defense. He testified that the State presented evidence that he was "the jealous one," that he was a threat to the victim, that he had tried to frame the victim by shooting up his own house, and that he basically was "a monster." He testified that trial counsel presented no evidence to rebut the State's evidence but that the decision had not been his choice. The Petitioner stated that if he had seen the photographs presented at the post-conviction hearing before trial, then he would have been confident in telling his story to the jury. He stated he did not testify because he did not understand how the court system worked, and his attorney did not explain it to him. The Petitioner further stated that he initially advised his attorney he wanted to testify because he wanted people to know his side of the story; the only reason he waived his right to testify was that his attorney advised him that the only benefit to testifying would be an instruction on self-defense. He stated he did not know he could not assert self-defense without a jury instruction. He thought he could have swayed the jury if he had testified. He also thought the photographs and other evidence would have helped to paint a better picture of what really happened, which he claimed was that the victim was threatening the Petitioner. The Petitioner stated the photograph with the phrase "In Guns We Trust" on it meant that the victim would use his gun "by all means necessary."

The Petitioner then explained that he believed the victim was the person who shot at his house not long before the victim was shot, and he denied that he had shot at his own home. The Petitioner stated the phone dump of the victim's phone showed the victim had searched for the Petitioner's address on the same date and close in time to when his home was "shot up." The Petitioner further testified that photographs showed the victim owned multiple guns, which he claimed was important to rebut the State's position that the Petitioner was trying to frame the victim for shooting his house. The Petitioner stated that nothing was presented at trial to refute the theory that the Petitioner had been the person to shoot his own house. The Petitioner agreed that the State had introduced bullet shells and photographs of the scene at the Petitioner's house after it was shot.

The Petitioner denied he was "on a manhunt" for the victim when the victim was killed. He stated he did not know the victim was in Ms. Reed's car that day because she had told him she was in the car on the way to work when he spoke to her. The Petitioner opined that if there had been an adequate investigation, if he had testified, if all the text messages had been introduced, and if the evidence of the photographs had come in, then the result of the trial would have been different. He stated that if he received a new trial, then he would testify.

Next, the Petitioner testified that the prosecution committed misconduct throughout the trial by misstating the evidence and that trial counsel did not object. Specifically, he claimed that the State said that the victim was unarmed, that the Petitioner executed the

victim, and that the Petitioner was in an erratic mindset when he got the video of the victim and Ms. Reed having sex. The Petitioner, however, denied having been upset by any video.

On cross-examination, the Petitioner admitted he shot the victim, which was captured on the store's surveillance video shown at his trial. He stated the victim had previously told the Petitioner what he was going to do to him, but he admitted to no communication with the victim the day of the shooting. The Petitioner admitted he saw the car but stated he did not know the victim was at the store. He acknowledged that the victim did not initially have a gun and that he chased the victim into the store and shot him. He testified that when he was chasing the victim, he believed the victim was trying to shoot him first, but in hindsight, he admitted that he now knows the victim did not shoot at him first. Thus, he admitted that when he saw the victim, he drew his gun and shot him.

However, the Petitioner maintained the shooting was in self-defense. He testified that when the victim was leaving the store, he saw the victim reach for his hip, and he thought the victim had been reaching for a gun. The Petitioner admitted he was in a car at the time and could have pulled away, but stated he did not because he was looking for Ms. Reed.

The Petitioner admitted he told the police he did not want to prosecute the victim for shooting at his house, but he claimed he had no choice but to sign the document when the police said they did not have enough evidence to prosecute. He admitted he could have told the police to keep investigating, but he did not think it would have mattered at the time. He testified that he had not declined to prosecute so he could personally deal with the victim, as evidenced by his attempt to do the lawful thing by filing a police report. He blamed the police for stating they could not proceed with the incident, and he did not know he did not have to sign the refusal-to-prosecute form. He agreed that the failure to prosecute was presented at his trial. The Petitioner denied having handled the house shooting on his own and stated he had seen the victim as a threat.

The Petitioner admitted that, although he claimed that trial counsel visited him only once at the jail, he saw his attorney at all his hearings. The Petitioner contended that trial counsel did not talk to him at the hearings in the back. He claimed that trial counsel never reviewed discovery with him, never discussed a legal strategy or defense with him, never investigated or spoke with witnesses, never reviewed the phone dumps with him, and never advised him that the phone dumps existed.

The Petitioner also did not dispute that there was no way trial counsel could have kept the video of the shooting of the victim from being shown to the jury at trial. He agreed that the video was shown to the jury multiple times at trial. The Petitioner averred that just

- 9 -

because he had his gun out as he approached the victim did not mean he was "ready" to shoot. The Petitioner admitted that he had seen the video of the shooting multiple times and that the victim was walking toward his own vehicle and was not shooting at the Petitioner's vehicle. The Petitioner claimed he was very distressed at the time and had believed the victim had a gun and that the victim had shot at him. The Petitioner again acknowledged there was no proof the victim shot at him first. The Petitioner, however, disagreed that if the victim shot at him later, then the victim would have been acting in self-defense. The Petitioner asserted it was not just the video that resulted in his conviction; he claimed the prosecution's various misstatements to the jury were also used to convict him.

The Petitioner agreed that trial counsel argued for voluntary manslaughter and that there had never been any dispute that the Petitioner had killed the victim. The Petitioner, however, testified that trial counsel should have objected to "a lot of the evidence" and should have presented evidence to clarify the record, such as more than just four pages of texts between himself and the victim. He stated he thought the text messages would have painted him in a more flattering light to the jury because they showed he was being nice and respectful. The Petitioner also stated that trial counsel should have communicated more with him and ascertained whether a plea was ever offered, as he had never heard of any plea offer. He stated he had sent a letter to trial counsel inquiring if a plea had been made, but he never received a response. He also said he may have asked trial counsel about it in court, but did not receive an answer. He admitted he would not have pled as charged.

On redirect examination, the Petitioner stated the video was not the "full story" because a great deal more had been going on between him and the victim, which was not introduced at trial. The Petitioner stated he had wanted to present both self-defense and voluntary manslaughter as defenses to his charge at trial. He thought he had a reasonable fear of the victim based upon their interactions and that self-defense was supported. He claimed the text messages in which the victim stated he was going to kill the Petitioner would have supported self-defense, but were not introduced at trial. He claimed the messages said things like, "Come on b****. Watch you meet yo' maker. I know where you live." He stated he saw a gun on the victim's right hip and believed he was being fired upon based on his personal interactions with the victim. He agreed he shot at the victim three times, but he stated he only hit him once.

Trial counsel testified that he followed a system he used in every trial during the Petitioner's trial. In this case, trial counsel was first visited at his office by the Petitioner's cousin, who hired him to represent the Petitioner. He stated that the first thing he did was to see the Petitioner in jail to begin working on the case. He testified that he generally holds off on taking any "deep dives" into the evidence until he receives the State's discovery. After he receives and reviews the discovery, his practice is to sit down with the

client, go over it, and develop a strategy. He testified that he generally takes notes during meetings with the client and again when he receives discovery. He then usually mails the discovery to the client. He testified that he could not recall specifically when he received the discovery in the Petitioner's case, but he did recall the video materials and the text messages. He also recalled that the Petitioner had talked about an ex-girlfriend and matters related to her. Trial counsel could not recall meeting with the Petitioner's counsel from General Sessions Court.

Trial counsel specifically recalled reviewing the discovery in the Petitioner's case. He stated he believed the case was problematic for several reasons. First, he testified that the video of the shooting showed the victim had his cell phone in his hand and was either putting it in his pocket or taking it out; trial counsel stated the defense tried to capitalize on this part of the video by arguing the Petitioner thought the phone was a gun. Second, trial counsel recalled the text exchanges were "pretty bad." Although the Petitioner thought the text messages demonstrated his innocence, they also gave the Petitioner a motive and showed threats going back and forth between the Petitioner and the victim. Next, trial counsel thought it was a problem that the Petitioner had refused to prosecute the shooting at his home. Another problem trial counsel recalled was the Petitioner's statement in a text message that he knew his ex-girlfriend was not in her car. Lastly, trial counsel found it problematic that the video showed the Petitioner pulling his vehicle in and blocking his ex-girlfriend's car.

Trial counsel stated he spoke with the Petitioner about the problems in the case a few times, but the Petitioner was adamant about the text messages coming into evidence. Trial counsel recalled discussions about whether the text messages should be excluded, but ultimately, all parties agreed to introduce them to establish context. Trial counsel could not remember which text messages had been entered into evidence. Trial counsel also testified that he would have discussed with the Petitioner the potential of testifying when preparing for trial. Trial counsel recalled that, while the Petitioner did not have a prior criminal record, he believed there could have been an issue with how the Petitioner would have presented himself to a jury, because the Petitioner could have become emotional, and because certain parts of his testimony would not have matched the evidence. Trial counsel opined that this would have been problematic and stated that they likely discussed it. Trial counsel testified that ultimately the Petitioner made the decision not to testify.

Trial counsel testified that he attempted to present self-defense to the jury, but the trial court refused to give the jury a self-defense instruction, so the defense relied on a voluntary manslaughter argument. Trial counsel was unsure whether the Petitioner's decision not to testify contributed to the trial court's denial of his request for a self-defense instruction, but he averred that if the Petitioner had testified, there may have been issues with the Petitioner's credibility. He also stated that he believed the video of the shooting

- 11 -

was difficult to argue against. The Petitioner pulled into the parking lot, blocked the victim's car, exited his own car with a gun already out, and fired shots at the victim, who was carrying a bag in one hand and his cell phone in the other. He agreed that the victim at some point had a gun, but stated it was clear it was not pulled at the beginning of the video.

Trial counsel testified that he received a cell phone dump that included Facebook messages and photographs. Trial counsel stated he recalled the messages more than the photographs, but he did not think the photographs were introduced at trial. He testified that in hindsight, the photograph of the victim, which stated "In Guns We Trust," possibly could have been relevant to the victim's violent nature. He agreed that another photograph showed the victim had looked for the Petitioner's address close in time to when the Petitioner's house had been shot. Trial counsel testified that the address information had come into evidence by other means. Trial counsel also opined that the guns in the photographs were not found with the victim, so they would not have been relevant. He recalled a pretrial 404(b) motion regarding the shell casings found at the Petitioner's house, which did not match the victim's guns or the Petitioner's gun. Trial counsel did not recall the specifics of the motion, but he agreed the other guns in photographs could have provided some clarity to the issue related to the shooting at the Petitioner's house or the victim's reputation for violence. Trial counsel noted, however, that it is not possible to see who is holding the guns in the photographs, and he stated that the issue of a reputation for violence was also in the record from the text exchanges.

Trial counsel then testified that he did not object to the prosecution's alleged misstatements because he considered the statements to have been proper arguments. He opined that the facts presented at trial accurately reflected a fair assessment of the overall situation between the Petitioner and the victim. He testified that some of the decisions to keep out portions of the text messages were strategic ones because some of the exchanges would not have helped the Petitioner's case.

Trial counsel recalled he was assisted at trial by a second attorney. He testified that after the trial concluded, both attorneys reviewed the case and determined there was nothing that could have been argued differently to get a different result. While they had hoped to get a self-defense instruction so they could argue both self-defense and voluntary manslaughter, when they did not receive it, they decided to pivot to the voluntary manslaughter argument based on the passion associated with the history between the Petitioner and the victim. He disagreed with the Petitioner about wanting more of the history to come into evidence because trial counsel believed it established a motive for the Petitioner. He specifically recalled working on the self-defense issues and the strategies involved in the case with the Petitioner.

Trial counsel testified that the prosecutor was a "tough" prosecutor, and he did not recall receiving a plea offer. He stated that if an offer had been received, then he would have taken it to the Petitioner.

Trial counsel stated he believed the Petitioner understood the pros and cons of his decision not to testify. He further noted that the Petitioner absolutely had adequate knowledge of the discovery before deciding not to testify. He opined that the Petitioner was better off not testifying because he would have testified in ways inconsistent with the other evidence, and he was not sure how the Petitioner would have been perceived on cross-examination. He could not be sure exactly when the Petitioner received the discovery, but he was certain he received it, and they had gone over it. He further stated that the Petitioner had not provided him with much information that required investigation.

On cross-examination, trial counsel stated he met with the Petitioner numerous times, either at the jail, in lock-up, or otherwise, prior to hearings. He was sure he discussed strategy and the text messages with the Petitioner, as well as other matters. He opined that the Petitioner received a fair trial and effective assistance of counsel.

The post-conviction court entered a written order denying post-conviction relief on April 16, 2025, which set forth its findings of fact and conclusions of law. This timely appeal followed.

## II.     ANALYSIS

On appeal, the Petitioner argues that the post-conviction court erred in finding that he failed to establish that he received ineffective assistance of counsel due to trial counsel's failure to present evidence, investigate, or call witnesses, failure to object to prosecutorial misconduct, failure to develop a theory of defense, and failure to subject the State's case to meaningful adversarial testing through the Petitioner's testimony. The State responds that (1) the post-conviction court appropriately denied relief because the Petitioner did not establish either deficiency in performance or prejudice and (2) the Petitioner's claim that trial counsel failed to develop a theory of defense and subject the State's case to meaningful adversarial testing through the Petitioner's testimony is waived for failure to raise the issue in the post-conviction court. We will address each of the issues raised in turn.

The Post-Conviction Procedure Act provides relief only when the petitioner's "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. In a post-conviction proceeding, the petitioner has the burden of proving his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. S. Ct. R. 28, Sec. 8(D)(1). "Evidence is clear and convincing when

there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against them, *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015) (citations omitted), while its application of the law to those factual findings and the conclusions drawn therefrom are reviewed de novo with no presumption of correctness, *Holland v. State*, 610 S.W.3d 450, 455 (Tenn. 2020) (citations omitted).

Both the Constitution of the United States and the Constitution of Tennessee provide the criminal defendant the right to the effective assistance of counsel. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."); Tenn. Const. art. 1, § 9 ("That in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel[.]"); *see also Davidson v. State*, 453 S.W.3d 386, 392-93 (Tenn. 2014). To succeed on a claim of ineffective assistance of counsel, the post-conviction petitioner must prove, and the record must affirmatively establish, both that counsel performed deficiently and that this deficient performance adversely impacted the petitioner's defense. *Strickland v. Washington*, 466 U.S. 668, 693 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). "A court need not address both prongs if the petitioner fails to demonstrate either one of them." *Davidson*, 453 S.W.3d at 393. Each element of the Strickland analysis of an ineffective assistance of counsel claim is a mixed question of law and fact that this court reviews de novo. *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)); *Kendrick*, 454 S.W.3d at 457.

Deficient performance is that which, in consideration of "all the circumstances" and the prevailing professional norms at the time of counsel's representation, falls below an objective standard of reasonableness. *Id*. (quoting *Strickland*, 466 U.S. at 688). We defer to counsel's strategic and tactical decisions, even if such decisions were unsuccessful or harmful to the defense, so long as they were "informed ones based upon adequate preparation." *Moore v. State*, 485 S.W.3d 411, 419 (Tenn. 2016) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). In other words, so long as counsel's decisions are made after adequate preparation, this court "will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Berry v. State*, 366 S.W.3d 160, 172-73 (Tenn. Crim. App. 2011). Thus, a petitioner who alleges ineffective assistance of counsel must, through clear and convincing evidence, overcome the strong presumption "that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation omitted).

The post-conviction petitioner must also prove that counsel's deficient performance affected the outcome of his or her trial; that is, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is that which is "sufficient to undermine confidence in the outcome" of the trial. *Id*. Accordingly, "a petitioner must establish that counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Mobley v. State*, 397 S.W.3d 70, 81 (Tenn. 2013) (internal quotation marks omitted) (quoting *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008)).

First, we address the Petitioner's argument that the post-conviction court erred in denying his claim that trial counsel was ineffective for failing to present evidence, investigate, or call witnesses. The Petitioner argues that trial counsel did not present the jury with a complete version of the facts that could have exonerated him. In support of this argument, the Petitioner claims trial counsel failed to present proof in support of the Petitioner's reasonable belief that the victim was armed by failing to present photographs of the victim with numerous guns, particularly after the Petitioner's home was "attacked by firearms"; that trial counsel failed to provide the jury with a full understanding of the Defendant's fear of the victim because he did not present all the text messages and videos which showed a "long-term pattern of threats and violent harassment by the victim"; that trial counsel failed to provide the jury with a full understanding of the Defendant's fear of the victim because he unsuccessfully and untimely mailed discovery to the Petitioner which caused the exclusion of proof contained in the discovery; and that trial counsel's failure to put all this information in front of the jury prejudiced the Petitioner.

In consideration of this argument, the post-conviction court found that the Petitioner did not carry his burden of proof as to either deficiency or prejudice on this claim, accrediting trial counsel's testimony. The post-conviction court specifically relied upon trial counsel's testimony that the photographs were not relevant either because the specific guns were not found with the victim or the person with the guns in the photos was not identifiable, that the evidence presented at trial presented an accurate depiction of the circumstances, and that there was not much information to investigate beyond what was included in the discovery.

The post-conviction court's findings are supported by the record. Trial counsel testified to having sent the discovery to the Petitioner and to having discussed the discovery, including texts and photographs, with the Petitioner. Trial counsel addressed the fact that the Petitioner had wanted to introduce everything to show the circumstances leading up to the shooting, but trial counsel testified to the potential pitfalls or relevancy concerns with introducing all the photographs and texts. The summary of the evidence from the direct appeal in this case, as quoted above, supports trial counsel's testimony that

the jury was presented with an accurate depiction of the circumstances surrounding and leading up to the shooting, including the video of the actual shooting, the mutual animosity between the Petitioner and the victim in the weeks leading up the victim's death, the fact that the victim was armed at some point, and the facts surrounding the shots fired at the Petitioner's home. Based upon the record, trial counsel's decision not to introduce all the photographs and text messages was a strategic one which we will not second-guess. *Berry*, 366 S.W.3d at 172-73. In addition, the post-conviction court's findings accredited trial counsel's testimony concerning the lack of relevance of the photographs of guns, which were not admitted. The post-conviction court did not err in its finding that the Petitioner failed to establish both deficiency and prejudice on this claim. The post-conviction court appropriately denied relief on this issue.

The Petitioner also argues that the post-conviction court erred in denying his claim that trial counsel was ineffective for failing to object to prosecutorial misconduct, including misstatements made during *voir dire* and closing arguments. Specifically, the Petitioner claims the prosecutor made misstatements of key facts during closing argument that the victim was unarmed, that the victim was shot more than once, that the shooting was an execution, and that the Petitioner was in a jealous rage due to a sex tape sent to him of the victim and the Petitioner's ex-girlfriend, Ms. Reed. In addition, the Petitioner argues that the prosecution's statement during *voir dire*, "But we all know guilt was determined in 2016," undermined the jury's role in determining guilt and innocence.

In its order denying relief, the post-conviction court relied on trial counsel's testimony, in which he stated that the prosecution did not misstate facts but rather made arguments to the jury about the evidence, which were appropriate and did not warrant an objection. The post-conviction court found that "[b]oth parties were able to cross or argue the alternative of these specific alleged misstatements" and found no ineffective assistance of counsel as the Petitioner established no deficiency or prejudice. At the post-conviction evidentiary hearing, the Petitioner agreed there was no dispute that he shot the victim and that the issue for trial had been his degree of culpability based upon all the facts. The State argued at the hearing that the Petitioner had taken the statement out of context because it was made in the context of the issue of degree of culpability. The Tennessee Supreme Court "has often observed that 'closing argument is a valuable privilege that should not be unduly restricted.'" *State v. Reid*, 164 S.W.3d 286, 320 (Tenn. 2005) (quoting *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001)). Both a defendant and the State have the opportunity "to persuade the jury of their theory of the case and to highlight the strengths and weaknesses in the proof" through closing arguments. *State v. Enix,* 653 S.W.3d 692, 701 (Tenn. 2022) (citing *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008)). To that end, the parties are usually afforded "the greatest leeway in their manner of expression" during closing arguments. *Banks*, 271 S.W.3d at 131.

Whether trial counsel's failure to object during a closing argument is generally sufficient for a showing of ineffective assistance of counsel has been considered by this court previously. *See Lance v. State,* No. M2005-01765-CCA-R3-PC, 2006 WL 2380619, at *6 (Tenn. Crim. App. Aug. 16, 2006), *perm. app. denied* (Tenn. Dec. 18, 2006). In *Lance,* this Court held that:

> [b]ecause the reviewing court must indulge a strong presumption that the conduct falls within the range of reasonable professional assistance and may not second-guess the tactical and strategic choices made by counsel unless those choices were uninformed because of inadequate preparation, it is highly unlikely that [the petitioner will succeed] in meeting either the deficiency or the prejudice prong of the ineffective assistance of counsel claim based on trial counsel's failure to object to the improper closing argument.

*Id.* (citations omitted); *see Strickland,* 466 U.S. at 690. This court has also "recognize[d] that the decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." *Smith v. State*, No. E2010-00488-CCA-R3PC, 2012 WL 260022, at *27 (Tenn. Crim. App. Jan. 30, 2012), *perm. app. denied* (Tenn. Jun. 25, 2012).

In *Rogers v. State*, this court stated the following about defense counsel's representation during *voir dire*:

> Despite its significance, a trial lawyer is "accorded particular deference when conducting *voir dire*" and his or her "actions during *voir dire* are considered to be matters of trial strategy." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). Also, "[a] strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Id.* Thus, it is imperative for a petitioner claiming ineffective assistance of counsel during jury selection to demonstrate that the resulting jury was not impartial. *See Smith [v. State]*, 357 S.W.3d [322], 348 [(Tenn. 2011)] (citing *Dellinger v. State*, No. E2005-01485-CCA-R3-PD, 2007 WL 2428049, at *30 (Tenn. Crim. App. Aug. 28, 2007)).

No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at * 35-36 (Tenn. Crim. App. Aug. 30, 2012), *perm. app. denied* (Tenn. Dec. 11, 2012).

Thus, closing arguments and *voir dire* are opportunities for the parties to make assertions about the evidence and their theories of the case. Here, regarding both closing

- 17 -

arguments and *voir dire*, the Petitioner has failed to demonstrate that his defense was prejudiced, that he was forced to accept a juror who was biased against him, or that any other harm resulted from counsel's conduct. As a result, the Petitioner has failed to show deficiency or prejudice. Accordingly, the post-conviction court appropriately denied relief on this issue.

The Petitioner also argues that the post-conviction court erred in denying his claim of ineffective assistance and in failing to specifically address his claim that trial counsel failed to develop a defense theory and subject the State's case to meaningful adversarial testing through the Petitioner's testimony. Specifically, the Petitioner argues that trial counsel failed to communicate a defense theory to the Petitioner and to adequately pursue a self-defense theory by advising the Petitioner not to testify, resulting in the trial court denying a jury instruction on self-defense. The Petitioner claims this deficiency prejudiced his ability to present a self-defense claim to the jury. The State argues this issue is waived because it was neither raised in the original petition nor ruled upon by the post-conviction court. In the alternative, the State contends that the Petitioner failed to carry his burden of proof on this issue.

Initially, we address the State's argument that the Petitioner has waived appellate review of this claim of ineffective assistance of counsel. In his brief, the Petitioner requested that this court give some latitude in consideration of his *pro se* petition based upon the evidence presented at the hearing, or, alternatively, remand this issue to the post-conviction court to make findings on this issue. The State cites to *Wiggins v. State*, No. M2024-013290-CCA-R3-PC, 2025 WL 1261710, at *3 (Tenn. Crim. App. Apr. 30, 2025), *no perm. app. filed*, arguing that "Tennessee appellate courts may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." The State concedes in its brief that the issue was argued at the post-conviction hearing but maintains that waiver is appropriate because the post-conviction court did not address the issue in its final order denying relief.

Prior to the presentation of evidence at the post-conviction hearing, the State noted that no amended petition had been filed and that the *pro se* petition was difficult to understand in some regards[2]. Post-conviction counsel then presented a brief opening statement indicating that the Petitioner was relying upon deficiencies by trial counsel in support of his claims of ineffective assistance of counsel. Post-conviction counsel

---

[2] The court notes that pursuant to Tenn. Code Ann. §40-30-107, the post conviction court is directed to enter a preliminary order appointing counsel, if appropriate, and directing counsel or the Petitioner to file an amended petition or a declaration that no amendment will be filed within thirty (30) days of the entry of the preliminary order. The trial court entered an order appointing counsel on January 5, 2022. However, the record contains no amendment or declaration that no amendment would be made.

specifically referred to evidence that was not presented at trial and to trial counsel's failure to provide the Petitioner with all the discovery in a timely manner. The State objected to any claim that the Petitioner did not receive discovery, asserting that such a claim was not contained in the *pro se* petition. Post-conviction counsel responded that this was part of the Petitioner's claim related to trial counsel's failure to do a proper investigation in the case, and the State argued that there was a difference between the two issues. Post-conviction counsel then addressed the State's objection and offered to "amend the petition to match the evidence that's presented today." Post-conviction counsel averred, however, that "the fact that he did not receive the discovery until August of 2018 is undisputed." The State argued that self-defense and discovery were separate issues because failing to present evidence was not the same as failing to provide discovery. The State then again pointed out the lack of clarity in the *pro se* petition and the difficulties it caused the State in adequately defending the case. Post-conviction counsel conceded this was an issue but stated, "[The Petitioner] is going to get on the stand today and present the evidence that supports his case. The lack of investigation is supported by his not being transmitted the discovery."

The post-conviction court agreed with the State that the discovery issue was a separate issue from the lack of investigation issue. Post-conviction counsel then argued that trial counsel had the discovery for approximately a year before providing it to the Petitioner and that this delay hindered the Petitioner and counsel's preparation for trial. Post-conviction counsel again stated, "We can amend our petition to match the evidence," to which the post-conviction court pointed out that no amended petition had been filed prior to the hearing, despite post-conviction counsel's having an opportunity to file an amended petition. Both parties made statements expressing concerns over the lack of clarity in the *pro se* petition. Post-conviction counsel advised the post-conviction court that she did not want to waive any issues the Petitioner would potentially testify to at the hearing. The State noted its responsibility to respond to the allegations and its disadvantage in not knowing what to prepare for in the hearing. In response to both sides' positions, the post-conviction court stated,

> It always is best if you can file – if the attorney can file a written petition so that we're all on notice. It's very hard for me to issue a ruling when I don't have things in writing about what, you know, is being alleged and just have to go on someone's testimony. It makes it difficult. But anyway, I think I can follow. Discovery was not shared with [the Petitioner]. I think I can keep up with that.

Post-conviction counsel then summarized by stating that the evidence would show that trial counsel's deficiencies prejudiced the Petitioner because he was unable to present a complete defense in the case, was unable to prepare adequately, and was not advised

effectively because there was not a full investigation. There was no specific mention of the Petitioner not testifying at trial or counsel's advice concerning this decision prior to the Petitioner taking the stand to testify at the post-conviction proceedings. There were no further requests to amend the petition during or after the hearing contained in the transcript, and the record does not include an amended petition.

The Tennessee Supreme Court Rules direct post-conviction courts to "liberally allow" petitioners to amend their petitions "[i]f evidence [during the hearing] is objected to on the basis that it concerns issues not raised in the petition or answer." Tenn. Sup. Ct. R. 28, § 8(D)(5); *see Holland v. State*, 610 S.W.3d 450, 457 (Tenn. 2020). "This approach promotes the proper preservation and airing out of all claims at the appropriate stage of the post-conviction proceedings." *Holland*, 610 S.W.3d at 457. Clearly, the post-conviction court liberally allowed an amendment to the petition related to the discovery issue during the evidentiary hearing, even over the State's objection. *See* Tenn. Sup. Ct. R. 28, § 8(D)(5). However, at no point did the Petitioner seek to amend the *pro se* petition to include his claim of ineffective assistance in failing to develop a defense theory and subject the State's case to meaningful adversarial testing through the Petitioner's testimony as raised here. Thus, the post-conviction court limited its ruling on the issue of ineffective assistance related to the Petitioner's claim of self-defense to the way it was raised in the *pro se* petition. The post-conviction court's final order did not contain a ruling on the Petitioner's claim, as raised on appeal, that trial counsel failed in not having the Petitioner testify in support of his claim of self-defense to rebut the State's evidence.

The Tennessee Supreme Court has stated that "[t]he post-conviction court's duty under [Tennessee Code Annotated section 40-30-111(b)] is mandatory" and that when the post-conviction court fails to make findings of fact and conclusions of law on issues raised in a petition, a remand is necessary to enable appellate review. *Tate v. State*, 679 S.W.3d 631, 632 (Tenn. 2023) (Order). However, a ground for relief by a post-conviction petitioner is generally waived where he does not include the ground in the petition. *See* Tenn. Code Ann. § 40-30-110(c); Tenn. Sup. Ct. R. 28, § 8(D)(4). While a petitioner may amend the petition within thirty days or at any other time upon a showing of good cause, *see* Tenn. Code Ann. § 40-30-107(b)(2), the Petitioner in this case did not file an amended petition. The hearing was held on October 25, 2024, and the post-conviction court's ruling was not filed until April 16, 2025, a nearly six-month period.

This court's authority does not extend to consideration of a post-conviction issue that was not raised in the original petition or any appropriately filed amendment.[3] *See State v. Bristol*, 654 S.W.3d 917, 927 n.4 (Tenn. 2022) (noting that post-conviction courts do not

---

[3] "Amendments to the petition shall conform substantially to the form for original petitions, except that matters alleged in the original petition need not be repeated." Tenn. Code Ann. § 40-30-104(g).

have discretion to consider unpresented or unpreserved issues pursuant to the Post-Conviction Procedure Act). "Tennessee appellate courts may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *See Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020); *see also Wiggins*, 2025 WL 1261710, at \*3.

The Petitioner did not properly raise or preserve this particular issue in his *pro se* petition, through any properly filed amendment, or even by an informal request to amend during the post-conviction hearing. Therefore, the post-conviction court did not err by failing to make findings of fact or conclusions of law on this issue. *See Davis v. State*, No. M2023-00048-CCA-R3-PC, 2024 WL 446441, at \*5-7 (Tenn. Crim. App. Feb. 6, 2024), *no perm. app. filed*. This court has no authority to review issues that were informally raised by the parties at the evidentiary hearing when the final order of the post-conviction court is limited to only the issues formally raised by the petitioner. *Id.* at \*7 (first citing *Morris v. State*, No. W2022-00208-CCA-R3-PC, 2023 WL 2733503, at \*36 (Tenn. Crim. App. Mar. 31, 2023) (finding waiver when the petitioner addressed an issue at the post-conviction hearing, but the issue was not contained in the petition or addressed in the post-conviction court's written order), *no perm. app. filed*); and then citing *Jones v. State*, No. W2020-01743-CCA-R3-PC, 2022 WL 99977, at \*5 (Tenn. Crim. App. Jan. 11, 2022) ("This issue is waived. Even though the issue was discussed at the post-conviction hearing and the State failed to object, the issue was not raised in a petition for post-conviction relief, and the post-conviction court did not rule on it."), *perm. app. denied* (Tenn. May 18, 2022)). Accordingly, we conclude that this issue is waived for appellate review.

## III.   CONCLUSION

Following our review of the record and based upon the foregoing analysis, we affirm the judgment of the post-conviction court.

_STEVEN W. SWORD_____
STEVEN W. SWORD, JUDGE

- 21 -